Robert PARKER, Plaintiff-Appellee,

v.

A. F. COOK, individually and in his capacity as Superintendent of Glades Correctional Institute et al., Defendants-Appellants.

No. 79-2259.

United States Court of Appeals, Fifth Circuit. Unit B

April 17, 1981.

---

Pamela L. Lutton, Thomas A. Beenck, Bruce Barkett, Asst. Attys. Gen., Dept. of Legal Affairs, Tallahasse, Fla., for defendants-appellants.

Robert Parker, pro se.

Before KRAVITCH and FRANK M. JOHNSON, Jr., Circuit Judges and ALLGOOD *, District Judge.

FRANK M. JOHNSON, Jr., Circuit Judge:

Plaintiff, an inmate at Glades Correctional Institution in Florida [GCI], was suspected of complicity in a scheme to sell favors to other inmates. After informing him that he was under investigation, prison officials placed him in "administrative segregation."

He remained administratively segregated for approximately six weeks, at which time he was transferred to a hospital unit for treatment of a cold and body sores; he was thereafter released to the general prison population. Plaintiff then filed this Section 1983 action seeking damages as well as declaratory and injunctive relief for the alleged deprivations of his Fifth, Eighth, and Fourteenth Amendment rights. In his complaint plaintiff alleged that he was subjected to summary discipline without due process of law when he was placed in administrative confinement without being afforded a hearing on the charges against him, that he was denied access to his attorney through the use of the mail or telephone during his incarceration in administrative confinement, that he was denied adequate medical care during his incarceration in administrative confinement, and that the conditions of his confinement constituted cruel and unusual punishment. After a trial on the merits, the district court held that the procedures used to place plaintiff in administrative confinement violated due process, that the conditions of plaintiff's confinement in administrative segregation constituted cruel and unusual punishment, and that the other contentions had no merit. Although the court granted declaratory relief, it denied plaintiff's claim for damages on the basis of the State officials' qualified immunity from damages.

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the State filed a motion to alter judgment. The State urged that the procedures for placing a prisoner in administrative confinement are not subject to due process restrictions and, alternatively, that the court's holding on the due process issue should be limited to procedures at GCI rather than the statewide penal system. The district court adhered to its original decision.

On appeal the State briefed three grounds of error. First, it argued that procedural due process is not required when a prisoner is administratively segregated.

---

* District Judge of the Northern District of Alabama, sitting by designation.

Second, the State contended that, if due process is required, its procedures provide sufficient process to comport with constitutional standards. Last, the State maintained that the district court's order should be limited in application to GCI. In oral argument, however, the State explicitly abandoned its first two contentions and argued only that statewide application was inappropriate.

We agree with the State's argument as limited and accordingly reverse that part of the district court's order mandating statewide application. We are unable to limit our discussion to that narrow issue, however, for to explain our holding on the statewide application issue, we must address and examine some of the facts and legal principles applicable to the district court's proper disposition of the now-abandoned issues.

■ We start with the proposition that the due process clause protects only those liberty interests created by the state.[1] Since states rarely if ever explicitly label their creations as "liberty interests," we must look to the substance of the state action to determine whether a liberty interest has been created. And whether this substance is embodied in a constitution, statute, regulation, rule, or practice is of no significance; once a state creates a liberty interest, "[n]o State shall . . . deprive any person of [the liberty interest] without due process of law . . . ." U.S. Const., Amend. 14, § 1. Of course, due process is a flexi-ble concept, and exactly what constitutes due process in any given situation depends on the nature of the liberty interest and the surrounding circumstances. *E.g., Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

■ The State of Florida has established a prison system in which to confine those persons who are, in accordance with constitutional procedures, convicted of crimes against the State. These persons, while deprived of their liberty to live in freedom, nevertheless remain under the protection of the Constitution. *E. g. Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "There is no iron curtain drawn between the Constitution and the prisons of this country." *Id.* at 555–56, 94 S.Ct. at 2974. Moreover, they remain recipients of whatever limited liberty interests the State may choose to grant them. As discussed above, once these liberty interests are created, they are protected against arbitrary deprivation by the due process clause. For example, if a person is convicted of armed robbery in Florida, he or she may be sentenced to prison for a term of years not exceeding life imprisonment, Fla.Stat.Ann. § 812.13 (West); however, this convicted felon may also be granted probation or parole. *Id.* § 947.16, § 948.01. Nothing in the Constitution requires the State to provide for probation or parole. *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979). Assuming that the initial sentence is not violative

---

1. The principle that the due process clause protects only those liberty interests created by the state supplied the basis for the Supreme Court decisions of *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). In dissent Justice Stevens severely criticized this approach, saying that "I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights." *Meachum v. Fano, supra,* 427 U.S. at 230, 96 S.Ct. at 2541 (Stevens, J., dissenting). In the recent case of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), Justice Stevens argued in dissent that the Court had abandoned its position and accepted as a constitutional principle that the word "liberty" in the due process clause, in and of itself, gives rise to interests protected by the due process clause. *Id.* at 580, 99 S.Ct. at 1895 (Stevens, J., dissenting). The *Bell* majority, however, pointed out that its position was consistent with precedent. *Id.* at 535, 99 S.Ct. at 1871 (citing *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977); *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 165-67, 186, 83 S.Ct. 554, 565-567, 576, 9 L.Ed.2d 644 (1963); *Wong Wing v. United States,* 163 U.S. 228, 237, 16 S.Ct. 977, 980, 41 L.Ed. 140 (1896)). Suffice it to say that while some Supreme Court cases can be construed to protect liberty interests other than those created by the state, for the purposes of this case we need not define the perimeters of the due process clause. For the purposes of this case we follow the rationale that the due process clause protects only those liberty interests created by the state.

of the Eighth Amendment or some other constitutional provision, the convicted felon may be lawfully imprisoned for the maximum sentence imposed. Once the State grants parole, however, the State cannot summarily and arbitrarily revoke it. *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). This is so because the convict's interest in parole status has become a liberty interest within the meaning and protection of the Fourteenth Amendment. Hence, due process must be afforded. Similarly, if the State establishes a procedure for granting parole and thereby creates an expectation of parole, due process attaches. *Greenholtz v. Nebraska Penal*

*Inmates, supra,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668. As with all liberty interests, the expectation of parole can be created by statute or regulation, *see id.,* or by practices of the State, *see Meachum v. Fano, supra,* 427 U.S. at 216, 96 S.Ct. at 2534; *Mitchell v. Hicks,* 614 F.2d 1016, 1019 (5th Cir. 1980); *see also Dumschat v. Board of Pardons,* 618 F.2d 216 (2d Cir. 1980); *Winsett v. McGinnes,* 617 F.2d 996 (3d Cir. 1980) (en banc).

■ By rule or regulation, the State of Florida authorizes at least two types of confinement [2] by which prison officials may segregate inmates from the general prison

2. Fla.Adm.Code Rule 33–3.08 provides in part
33–3.08 Discipline.
(1) The following terms, as defined, should be standard usage throughout the Department:
(a) "Disciplinary Team"—That group of employees designated by the institution administrator to handle formal disciplinary actions.
(b) "Administrative Confinement"—Confinement, other than disciplinary, which results in a loss of some privileges which the inmate would have if assigned to general population. Such confinement is effected pending disciplinary action or for reasons other than disciplinary. (See Section XII for additional information.)
(c) "Disciplinary Confinement"—Confinement, other than administrative confinement, which includes the loss of privileges normally afforded other inmates, and is effected only after procedures outlined in Section VII have been fully complied with.
(d) "Regular Diet While in Disciplinary Confinement"—Consists of three meals per day as are fed to the general inmate population, less desserts and beverages.
(e) "Special Diet While in Disciplinary Confinement"—Consists of three meals per day consisting of a Department standardized diet, with a minimum of 2100 calories daily nutrients essential to maintaining good health.
(f) "Material Witness"—Important witness having evidence relevant to facts in dispute—one whose testimony is important to decide case.
(2) The Secretary shall authorize the composition of an impartial team or teams at each correctional institution which shall administer discipline and shall authorize punishment for violation of any rules of prohibited conduct as listed by an inmate; provided, however, that such authority to punish shall be subject to the approval of the Superintendent and the Secretary as hereinafter provided. Any member of the disciplinary team should be disqualified as a team member if he has participated as an

investigating officer, was a witness, initiated the charge, or is the person designated to review the decision of the disciplinary committee.
(a) Disciplinary action shall be taken at such times and in such measures and degree as is necessary to regulate an inmate's behavior within acceptable limits.
(b) Inmate behavior must be controlled in a completely impartial, impersonal and consistent manner.
(c) Disciplinary action shall not be capricious nor in the nature of retaliation or revenge.
(d) Disciplinary action shall be taken as soon after the occasion of misconduct as circumstances permit.
(e) The determination of disciplinary measures against any inmate is the responsibility of the disciplinary team; however, limited action in minor infractions may be delegated.
(f) Corporal punishment of any kind is strictly prohibited.
(g) Leg irons or handcuffs shall be used on inmates only as a measure of restraint and not as punishment.
(h) The Department of Offender Rehabilitation shall cause a record to be kept of the violations of rules of conduct, the rule or rules violated, the nature of punishment administered, the authority authorizing such a punishment, the duration of time which the offender was subjected to punishment, and the condition of the prisoner's health. This information shall be maintained in the institutional inmate file; except one copy of the Disciplinary Report shall be forwarded to the Central Office of the Department of Offender Rehabilitation and one copy to the Florida Parole and Probation Commission.
(3) Rules of Prohibited Conduct and Penalties for Infractions. (DC shall be interpreted to mean Disciplinary Confinement; GT—as Gain Time.) It is emphasized that these are the maximum penalties assessible. The disciplinary team may feel that mitigating circumstances are present which indicate that some

lesser amount, or even no gain time be forfeited, or that some lesser amount, or even no disciplinary confinement, be served.

(4) For violation by any inmate of any of the rules of prohibited conduct, the Disciplinary Team may impose any of the following disciplinary measures which does not exceed the maximum penalty set forth previously in this section:

(a) A reprimand, probation for a specific term, or action suspended.

(b) Refer the case for individual counseling.

(c) Loss of mailing and/or visiting privileges for such period of time the team feels is commensurate with the violation. Normally, this alternative is selected when the violations involve these privileges, but this does not apply to legal mail or legal visits. Loss is not to exceed 60 days except when specifically approved by the Superintendent.

(d) Loss of any other privileges as the team determines to be justifiable to include extra duty assignments during leisure hours.

(e) Assigned to the disciplinary squad.

(f) Accept donations from inmates participating in the community work release only and not to exceed $50. The donation will be deposited in the Welfare Trust Fund and a receipt provided the inmate.

(g) Place in disciplinary confinement, on a part-time basis, on a regular diet with continued participation in assigned responsibilities.

(h) Place in disciplinary confinement, for an indefinite period of time not to exceed the maximum set forth in the "Rules of Prohibited Conduct and Penalties for Infractions." Disciplinary confinement will be utilized only as a last resort.

(i) Recommend loss of such gain time as the team feels is justified in each case up to the maximum penalty as set forth in the "Rules of Prohibited Conduct and Penalties for Infraction."

(j) Require payment of the replacement value if the offense involves destruction of property.

(5) Upon any violation by an inmate of any rule of prohibited conduct, the following procedures should be strictly adhered to:

(a) When an employee witnesses or has reason to believe that an act was committed by an inmate which is in violation of the "Rules of Prohibited Conduct," and if the infraction can be promptly disposed of without formal disciplinary report, the employee will take the necessary action to resolve the matter. For minor infractions the employee may complete a Corrective Consultation Form reporting the infraction and the corrective action taken. A copy of the Corrective Consultation Form will be provided to the inmate, and he will be informed that if he wishes to make a statement, such statement shall be appended to the Corrective Consultation Report, which should be kept in the inmate's institutional file.

(b) If the employee cannot resolve the matter, the inmate will be brought before the supervising officer on duty who may also complete a Corrective Consultation Form if appropriate. If the supervising officer is not able to properly dispose of the infraction, a formal disciplinary report will be prepared. The inmate may be placed in administrative confinement for the purpose of insuring immediate control and supervision when it is determined that the inmate constitutes a threat to himself, to others, or the safety of the institution. If the supervising officer places the inmate in administrative confinement, he will complete a report of administrative confinement. The inmate must be informed of the reasons for his placement in administrative confinement. If the inmate wishes to make a statement, such statement shall be recorded on the report of administrative confinement and the written details and reasons as to why the inmate was placed in this status must also be given. This report will be completed even though a disciplinary report is prepared. This action will be reviewed by the Classification Team and approved or disapproved by the Superintendent.

The Department of Offender Rehabilitation's policy regarding possible felony offenses committed by an inmate will be: Not to initiate formal disciplinary proceedings within the institution until it is determined whether prosecution will be effected in outside court.

The Superintendent or Officer-in-Charge shall report criminal offenses committed by inmates to the appropriate prosecuting attorney.

(6) In filling out a Disciplinary Report, the date on which the offense occurred and the section number of each offense charged should be stated. All charges must be confined to those listed under "Rules of Prohibited Conduct and Penalties for Infractions." A complete statement shall be made of the specific facts and circumstances which formed the basis for the charge of misconduct. It should be noted whether the inmate was placed in administrative confinement or left in the inmate population pending disposition.

(7) The supervising officer will initiate an impartial investigation of the charges against the inmate. A full and complete report of findings of the investigation shall be set forth. The investigating officer is responsible for obtaining the inmate version of the offense as well as contacting the charging officer and any other staff members that have information pertaining to be allegation and charges. The inmate charged will be asked if he has any material witnesses to offer in his behalf. If the inmate has no witnesses, it would be so noted in the report. If names of witnesses are given, the investigating officer will then interview both inmate and staff witnesses. If inmate witnesses or staff witnesses were not contacted, a

statement as to why they were not contacted should also be included. Opinions as to guilt or innocence will not be made by the investigating officer. The report of the investigation must include:

(a) The inmate's version of the offense.

(b) Name of employee and inmate witnesses.

(c) Pertinent statements from all employee and inmate witnesses. The officer conducting the investigation should indicate in his report whether the inmate was placed in administrative confinement or left in the inmate population pending disposition of the charge(s).

(8) Upon completion of the investigation, the disciplinary report and investigative report will be submitted to the Disciplinary Team. The Disciplinary Team shall meet and review the disciplinary report and investigative report.

(a) If no disciplinary measures need to be taken, or if the Disciplinary Report can be disposed of otherwise without hearing by imposing punishments listed in Section 308.-3(3)(a–j), the Disciplinary Team shall meet and review the disciplinary report and investigative report. If no disciplinary action is determined necessary, the Disciplinary Report shall not be placed in the inmate's institutional file, but shall be placed in a separate institutional file designated expressly for that purpose.

(b) If the information in the Disciplinary Report and investigation indicate that the inmate must appear to answer the charges, the Disciplinary Team will request the inmate be given a copy of the charges. The date and time to appear before the Disciplinary Team will also be indicated.

(9) A copy of the charges will be personally delivered to the inmate at least twenty-four (24) hours in advance of the hearing. The officer delivering the charges will ascertain that the inmate understands each charge and the date and time to appear. If the inmate cannot read, the officer will read each charge to him. The officer will record on the Disciplinary Report the date and time the charges were delivered.

(a) There may be extreme cases in which the inmate may waive the 24-hour waiting period. In such cases, the waiver should be signed by the inmate, witnessed by an employee, and copies of this waiver attached to each copy of the Disciplinary Report.

(10) The Disciplinary Team shall meet as often as is required to insure that disciplinary infractions are disposed of in a timely manner, normally not to exceed one week from date of delivery of charges.

(11) Hearings will not be open to the public.

(12) The chairman of the Disciplinary Team, or a majority of the members of the Disciplinary Team, have the authority to initiate the following actions:

(a) To require the person filing the charges personally appear before the Disciplinary Team at the time of the hearing.

(b) To request that the investigating officer personally appear before the Disciplinary Team at the time of the hearing.

(c) To request available resource personnel such as medical staff, work supervisors, psychologists, or other personnel in a consultant capacity.

(d) To require the inmate file and medical records to be made available at all hearings.

(e) To restrict questions and answers to relevant matter to preserve decorum and to limit repetition.

(f) To postpone the hearing for a good and valid reason.

(g) To request other supporting documents.

(13) When the Disciplinary Report is of such a nature that it can be determined that the maximum disciplinary action if imposed does not warrant the loss of gain time or disciplinary confinement, the Disciplinary Team may conduct a hearing and impose restrictions on the inmate by observing the following procedures:

(a) When all people designated to appear at the Hearing have assembled, the Chairman will call the Hearing to order. Witnesses will not be present in the Hearing Room except to give their testimony.

(b) The chairman will record the date and time of the hearing.

(c) The inmate will be called before the Disciplinary Team.

(d) The procedures that will be followed in this hearing will be explained to the inmate.

(e) The charge will be read to the inmate as documented on the Disciplinary Report. The inmate will be questioned to determine if he understands the charge.

(f) The inmate will then be asked whether he admits that the report against him is true. If he does, no further evidence need be heard; but the inmate should be allowed to offer any statement he wishes concerning his misconduct, which will be considered by the Disciplinary Team in making its recommendations. If the inmate does not wish to make a statement, this will be made known in the record. The Disciplinary Team is now ready to make its decision. (Proceed to 13(g) and continue to conclusion.)

(g) If the inmate does not admit the misconduct he shall be allowed to explain his conduct, relevant circumstances and may offer real evidence in his own behalf.

(h) The inmate will be permitted to make a final statement.

(i) During the Disciplinary Team's deliberation regarding the decision, everyone except the Team shall be required to vacate the hearing room. The Team shall discuss the case, deciding upon the findings of facts that are supported by the evidence and upon the recommendations to be made.

(j) When a decision has been reached and is ready to be rendered, the inmate being charged will then be called into the hearing room for an explanation of the decision. In stating its findings and making its recommendations the

Team must make specific reference to the evidence it relied on.

(k) Upon conclusion of the hearing the Disciplinary Team will write a statement as to the evidence relied on and reasons for the disciplinary action. The chairman of the Disciplinary Team will sign the Disciplinary Report, the names of the other two members will be typed on the report; actual signatures shall also be affixed. If an inmate's release date is within the next four months, the Disciplinary Report should be flagged for processing at all levels.

(14) Whenever the Disciplinary Report is of such a nature to warrant consideration of disciplinary confinement and/or loss of gain time, the Disciplinary Team shall conduct the disciplinary hearing, observing the following rules:

(a) The chairman will record the date and time of the hearing.

(b) The inmate will be called before the committee.

(c) The procedures that will be followed in the hearing will be explained to the inmate.

(d) The charge will be read to the inmate as documented on the Disciplinary Report. The inmate will be questioned to determine if he understands the charge. When the inmate is illiterate or where the complexity of the issues makes it unlikely that the inmate will be able to properly represent himself, the inmate shall be provided a staff representative.

(e) The inmate will then be asked whether he admits that the report against him is true. If he does, no further evidence need be heard; but the inmate should be permitted to offer any statement he wishes concerning his misconduct, which will be considered by the Disciplinary Team in making its decision. (Proceed to (14)(j) and continue to conclusion.)

(f) When the hearing is resumed, the inmate and/or staff representative shall be afforded reasonable opportunity to explain his conduct, the relevant circumstances, and to present evidence about the disciplinary report.

(g) The Disciplinary Team can request that the chairman arrange for additional investigation or evidence, or for the appearance of additional witnesses, or for the statements of unavailable witnesses.

(h) The chairman may determine that the source of certain information should not be revealed to the inmate; for example, when the disclosure may endanger the safety or well-being of another person. In such case, the report of the Disciplinary Team should summarize the circumstances and the reasons for this determination. Otherwise, all evidence heard or seen by the Disciplinary Team should be made known to the inmate (and/or his representative.)

(i) The inmate or the Disciplinary Team may request material witnesses. The chairman will call those witnesses (staff or inmates) who are available and who are determined to be necessary for an appreciation of the circumstances. Repetitive witnesses will not be called. Unavailable witnesses may submit written statements. Witnesses will not be called if doing so would create a risk or reprisal or would undermine authority. The inmate witness must be willing to testify. An inmate witness may elect to offer an oral or written statement to the investigating officer in lieu of a personal appearance before the Disciplinary Team. The chairman should note in the report the reasons for declining to call requested witnesses.

(j) The inmate (and/or his staff representative) shall be permitted to make a final statement.

(k) During the Disciplinary Team's deliberation regarding the decision, everyone except the Team shall be required to vacate the hearing room. The Team shall discuss the case, deciding upon the findings of fact that are supported by the evidence, and upon the recommendations to be made.

(l) When a decision has been reached and is ready to be rendered, the inmate (and/or his staff representative) being charged will then be called into the hearing room for an explanation of the decision. In stating its findings and making its recommendations, the Team must make specific reference to the evidence it relied on.

(m) Upon conclusion of the hearing, the Disciplinary Team will write a statement as to the evidence relied on and reasons for the disciplinary action. The Chairman of the Disciplinary Team will sign the Disciplinary Report, the names of the other two members will be typed on the report; actual signatures are not required. If an inmate's release date is within the next four months, the Disciplinary Report should be flagged for processing at all levels.

(15) Review provisions are granted to road prison captains, vocational center chiefs, and correctional center chiefs; and they may act as review authority and may approve, modify downward, or disapprove the recommended disciplinary action. Superintendents act as approving authority and may approve, modify downward, or disapprove the recommended disciplinary action or may return the report to the Team for additional information, or for reconsideration as he may deem necessary. The final reviewing authority is the Director of Adult Services Program Office in the Central Office who may approve, modify downward, or disapprove the recommended disciplinary action or may return a report to the institution for additional information.

(16) Forfeiture of Unearned Gain Time: Loss of gain time in advance of the inmate's having earned this gain time will be considered only when the inmate does not have sufficient earned gain time accrued to achieve the desired corrective results.

Loss of unearned gain time should be used selectively, and only when extreme violations are involved. Taking a large portion of unearned gain time should be avoided.

The procedure for recommending loss of unearned gain time is as follows: A routine disciplinary report (DC–1) should be submitted recommending the loss of a specific number of days of unearned gain time and the total amount earned and unearned gain time the Team wishes the inmate to lose.

(17) Restoration of Forfeited Gain Time: Forfeited gain time may be restored only on the recommendation of the Superintendent and in situations where it is felt that the time was improperly forfeited or where it appears that an error was made, which should be corrected. For example, this could be done where new information indicates that the inmate was not involved in the offense or was not involved to the degree previously thought.

(18) Transfers: Job assignments and transfers between institutions are classification determinations rather than disciplinary decisions. If, in the course of conducting disciplinary procedures, a job reassignment or transfer is indicated, it should be handled as classification matters are normally handled at that institution and not as disciplinary decisions.

If it becomes necessary to transfer an inmate who is waiting disciplinary action, the Team hearing should be held prior to transfer.

Exceptions to this may be made only in extreme circumstances such as strikes or disturbances involving many inmates where the situation dictates immediate transfer before the disciplinary hearings can be held. A memorandum explaining the circumstances precluding the scheduling of the hearing will be sent with the inmate at the time of the transfer. In such cases, the disciplinary hearing will be held within a reasonable period of time.

(19) Administrative Confinement: The following procedures must be performed prior to placing an inmate in administrative confinement:

(a) The Correctional Shift Supervisor must cause a Report of Administrative Confinement to be completed and the inmate must be informed of the reasons for his placement in administrative confinement. If the inmate wishes to make a statement, such statement shall be recorded on the form. Written, complete details and reason(s) as to why the inmate was placed in this status must also be given.

(b) This action will be reviewed by the Classification Team, approved by the Superintendent, and the form then placed in the inmate's record.

(c) Inmates in administrative confinement will be reviewed at regular intervals by a representative of the Classification Team for possible release.

(d) Nothing in this rule should be construed so as to prevent the employee from immediately placing in administrative confinement any inmate who poses an immediate threat of violence or disruption to himself, other inmates, Department employees, or the institution generally. However, the procedure under "a" above should be completed at the earliest practical time.

(e) Reasons for Placing Inmates in Administrative Confinement

1. Awaiting disciplinary action.

2. For investigation.

3. For protection. (A very complete and thorough investigation should be accomplished prior to denying such a request. The investigation should be in such detail as to resolve any reasonable doubt as to the need for such confinement. The investigation should be documented in writing and placed in the inmate record.)

4. At the inmate's own request for good and valid reasons.

5. Pending trial for a crime committed in the Department.

6. Death Row cases.

7. Custody risks who cannot be held in the regular inmate population.

8. Inmates who after disciplinary confinement appear to the Classification Team to be potentially assaultive or disruptive and who still cannot reasonably and safely be returned to the regular inmate population.

(20) Disciplinary Confinement: Disciplinary confinement will be utilized only as a last resort. All inmates initially placed in disciplinary confinement will receive regular diet less dessert and beverage. At no time shall an inmate in disciplinary confinement be placed on a special diet unless approved by the Superintendent of the institution. Furthermore, no inmate shall be placed or retained on a special diet as to such extent as to endanger his health.

(a) Regular diet shall consist of three main meals per day as are fed to the general population less desserts and beverages other than water.

(b) Special diet shall consist of a standardized Department of Corrections diet. It consists of three meals per day of a formula which has been determined by dietary authorities to contain a minimum of 2100 calories daily and nutrients essential to maintain good health.

(21) An inmate in disciplinary confinement shall be furnished with a mattress and with sufficient blankets to keep warm.

(22) An inmate may be deprived of clothing, bedding, and other comfort items in order to prevent him from inflicting injury to himself or others or to prevent destruction of property or equipment. A record of such deprivations must be maintained by institutional personnel.

(23) The Superintendent or his designated representative shall see and talk to each inmate in disciplinary confinement at least once each morning and once each afternoon. At each of these times, the inmate's general condition and attitude will be ascertained and noted in writing. The report is to be signed and shall be made available to prison inspectors upon request and placed in the inmate's file.

population.[3] First, disciplinary confinement is authorized in those cases in which prisoners are found to have violated one of the specified rules of conduct. Fla.Adm. Code Rule 33–3.08. Placing a prisoner in disciplinary confinement clearly affects the prisoner's liberty interest, e. g., *Wolff v. McDonnell, supra,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d, 935, and thus invokes the protections of the due process clause. In recognition of this due process protection, the State affords process to inmates charged with misconduct. In recognition of the magnitude of liberty interests affected when an inmate faces confinement in disciplinary segregation or loss of gain time, the State provides more procedural safeguards than provided when a lesser liberty interest is at stake. *Compare* Fla.Adm.Code Rules

33–3.08(5)–(14) *with* Fla.Adm.Code Rule 33–3.08(19).

The second type of segregation authorized in Florida is administrative confinement.[4] The applicable regulations concerning administrative confinement specify that it "results in a loss of some privileges which the inmate would have if assigned to general population." Fla.Adm.Code Rule 33–3.08(1)(b). Although the regulations do not specify exactly what the conditions of administrative confinement will be, administrative confinement, with its attendant loss of privileges, appears to be less desirable from the inmate's viewpoint.[5] The regulations also list the reasons an inmate may be placed in administrative confinement, thus acknowledging that arbitrary assignments are not authorized[6] The reasons for

(24) When needed, cells shall be designated to be used for disciplinary confinement. Such disciplinary confinement cells shall be equipped with security toilet fixtures, facilities for drinking water, necessary ventilation and heat and protection from the weather. Disciplinary confinement cells in institutions constructed after the adoption of these rules and regulations shall not be less than seven feet by nine feet (7' × 9') and a ceiling height of not less than eight feet (8').

(25) Release from Disciplinary Confinement: Disciplinary Team Members will frequently review the case of each inmate in Disciplinary Confinement, determine the inmate's attitude and return the inmate to the regular inmate population when, in the Team's opinion, he may reasonably be expected to adequately adjust and conform to the rules and regulations. Disciplinary confinement should always be for the shortest period of time that accomplished the desired results of favorable adjustment.

No inmate will be held in disciplinary confinement to exceed the maximum penalty for the rule violation. However, in all cases when an inmate is in disciplinary confinement or on special diet longer than 30 days, a personal review and approval for continuation by the Superintendent is required.
Specific Authority 20.315, 944.09, 944.28, 945.-21 FS. Law Implemented 944.09, 944.15, 944.-28, 944.34, 944.35, 944.49, 945.21 FS. History—New 10–8–76, Amended 11–9–77, 5–1–79.

3. We observe that it is not inherently unconstitutional to differentiate among classes of prisoners, providing some classes with more desirable living conditions; for example, "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike when differentiation is necessary to avoid an

imminent threat of institutional disruption or violence." *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 137, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977). Indeed, failure to segregate dangerous inmates from their less dangerous counterparts may constitute cruel and unusual punishment of the less dangerous inmates. *Jones v. Diamond,* 636 F.2d 1364, 1374 (5th Cir. 1981).

4. The distinction between what is usually referred to as administrative confinement and what is usually referred to as disciplinary confinement was succinctly summarized in *United States ex rel. Gereau v. Henderson,* 526 F.2d 889, 896 (5th Cir. 1976).

By "administrative" transfer we mean one that is based solely on proper administrative and correctional criteria, and *not* on an inmate's institutional behavior. In a truly administrative transfer, the reasons for transfer are extrinsic to the inmate's prison behavior
. . . .
A nondisciplinary transfer is closely akin to the initial determination of the place and specific facility for confinement . . . .

5. We observe that in some instances administrative confinement may be more desirable from the inmate's viewpoint, for inmates may be placed in administrative segregation at their own request. Fla.Adm.Code Rule 33–3.-08(19)(e)4.

6. The principle that states may not act arbitrarily against prison inmates or felons has been repeatedly recognized in a variety of contents. *See, e. g., Bell v. Wolfish, supra,* 441 U.S. at 539, 99 S.Ct. at 1874. ("[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a

placing an inmate in administrative confinement are as follows:

1. Awaiting disciplinary action.
2. For investigation.
3. For protection....
4. At the inmate's own request for good and valid reasons.
5. Pending trial for a crime committed in the Department.
6. Death Row cases.
7. Custody risks who cannot be held in the regular inmate population.
8. Inmates who after disciplinary confinement appear to the Classification Team to be potentially assultive [sic] or disruptive and who still cannot be held in regular inmate population.

*Id.* 19(e). Often, the decision to place an inmate in administrative confinement requires no more than an examination of a prison file, as in the case of placing a death row inmate in confinement.[7] In other cases, however, the decision may be complex and may depend upon the resolution of many factual questions. Examples of the latter type case include those cases involving inmates who are deemed to be custody risks that cannot be held in the regular inmate population or cases involving inmates who after disciplinary confinement appear to be potentially assaultive or disruptive and who cannot reasonably and safely be returned to the regular inmate population. The State of Florida, however, affords all inmates, regardless of the reason for which they are administratively confined, the same procedural safeguards. Basically, these procedures provide written notice to the inmate of the reason for administrative confinement and an opportunity for the inmate to make a statement. No provision is made for the inmate to present evidence in his own behalf.

The district court found that at the time plaintiff was confined in administrative segregation, the conditions of administrative segregation at GCI were almost identical to the conditions of disciplinary confinement. The same fifteen-cell wing was used to house administrative and disciplinary detainees;[8] furthermore, when it was neces-

court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.") *Sullivan v. Ford*, 609 F.2d 197, 198 (5th Cir. 1980) (recognizing the prohibition against arbitrary prison regulations); *Cruz v. Beto*, 603 F.2d 1178 (5th Cir. 1979) (recognizing that prison officials may not arbitrarily segregate inmates because they are clients of a certain attorney); *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir. 1978) (recognizing that states may not arbitrarily curtail correspondence of inmates with free citizens); *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) (recognizing that states may not arbitrarily reenfranchise some felons and leave others disenfranchised).

7. It appears that, when a person in Florida is convicted of a capital crime and sentenced to death, that person is transferred to a prison and immediately placed in administrative segregation. Because death row inmates are never placed in the general population or given an expectation of being placed in the general population, it appears that no liberty interest is affected when they are placed in administrative segregation. Assuming that the State's classification of these inmates is sufficiently rational to withstand an equal protection challenge (a question about which we express no opinion) and that all other constitutional guarantees are

met, *cf., Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (segregation of prisoners on the basis of race violates the Equal Protection Clause), the states are free to choose this alternative; in the absence of a liberty interest, due process is inapplicable.

8. The district court described the physical condition of the segregation wing as follows:

The cells are similar, each measures five feet by eight feet. The cells have metal doors with heavy grating over the openings therein. Each cell has an entrance for the supply and removal of food trays. The cells are equipped with commodes, a sink with only cold water, two mattresses, two mattress covers and four blankets. There are bunk facilities on which to place mattresses in some of the cells, in others one of the mattresses must be put on the floor.

Lighting and climate control in the cells at the time complained of were non-existent. There are no lights in the corridor outside of the cell doors. Only natural light was provided during the daytime hours.

Ventilation was by "natural air flow." No circulation or exhaust fans were used. There was no automatic cooling or heating system. In fact, there was no heating system whatsoever in the building. During plaintiff's segregation the temperature in his cell often

sary to house more than one inmate in each cell, inmates in administrative segregation were often confined in the same cell as inmates in punitive segregation. The only differences between administrative and punitive confinement, which the district court aptly characterized as "minor, if not negligible distinctions," were that administrative confinees had certain tobacco privileges that were denied disciplinary confinees, and administrative confinees could shower twice a week as compared to the once-a-week shower allowed disciplinary detainees.[9]

Reasoning that the consequences of administrative segregation were virtually identical to the consequences of disciplinary segregation, the district court found that the rule of *Wolff v. McDonnell, supra,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, which requires due process in prison disciplinary proceedings, applies to inmates placed in administrative segregation in the Florida penal system. Rather than limit its holding to the procedures employed at GCI, the district court rendered a judgment affecting the entire state system. This was necessary, in the court's opinion, because the regulations upon which the officials at GCI relied to administratively segregate inmates were applicable statewide. Apparently, the court reasoned that, if the regulations produced unconstitutional results when implemented at GCI, they would produce unconstitutional results at any other Florida prison. We agree that the regulations produced unconstitutional results at GCI, but, for the reasons detailed below, we feel that the record does not support a judgment affecting the statewide penal system.

As to the conditions at GCI, we think it self-evident that the State of Florida cannot, by merely attaching the label of administrative segregation to its actions, transform what is in substance disciplinary action subject to due process restrictions into administrative action outside the purview of the due process clause. *See Wright v. Enomoto,* 462 F.Supp. 397, 402 (N.D.Cal. 1976) (3-judge court) ("When a prisoner is transferred from the general prison population to the grossly more onerous conditions of maximum security, be it for disciplinary or for administrative reasons, there is severe impairment of the residuum of liberty which he retains as a prisoner—an impairment which triggers the requirement for due process safeguards."), *aff'd* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). Regardless of what the State chooses to call the confinement to which plaintiff was subjected, the fact remains that the State, through regulation if not practice, had granted plaintiff a liberty interest in being free from arbitrary transfers from the general population to disciplinary segregation. In spite of this state-granted liberty interest, plaintiff was removed from the general population and, without being afforded the very process due him by regulation, placed in an environment almost identical to that which the State had, by regulation, reserved for inmates who, after being afforded due process, were found guilty of certain acts of misconduct.[10] This does not comport

reached into the 40° range and was in the 30° range on at least one occasion. The method of controlling the temperature in segregation was simply to hand out an additional blanket.
It should be noted that the inmates in segregation were allowed to wear only a tee-shirt and short, mid-thigh pants.

9. On appeal the State urged that the following additional distinctions existed: that administrative confinees could receive desserts or beverages with their meals, but disciplinary confinees could not; that administrative confinees were allowed various reading materials, but disciplinary confinees were not; and that administrative confinees could arrange to have

visitors, but disciplinary confinees could not. But the State did not explicitly challenge as being clearly erroneous the district court's finding that the only distinctions related to shower and tobacco privileges, and a review of the record convinces us that, if such a challenge had been advanced, the district court's findings should be sustained. We observe, however, that the minor additional distinctions urged by the State on appeal would have no bearing on our decision today.

10. While having no bearing on our decision today, it is interesting to note that if plaintiff had been charged with and found guilty of the misconduct of which he was suspected, under the prison rules and regulations he could not

with the constitutional mandate of *Wolff v. McDonnell,* and we accordingly affirm the district court's judgment insofar as it affects GCI. *See generally Taylor v. Clement,* 433 F.Supp. 585, 587–88 (S.D.N.Y.1977) ("[W]e take it to be axiomatic that prison officials cannot avoid their due process responsibilities simply by relabelling the punishments imposed on prisoners within their charge.")

■ As to the statewide application issue, we first acknowledge that an initial assignment to a prison or a transfer from one prison to another is not generally subject to due process restrictions.[11] This is so because in the past states generally have not given convicts a liberty interest in serving their sentences at particular facilities. Of course, it goes without saying that states could grant convicted persons such a liberty interest, which would then be protected by the due process clause against arbitrary deprivations.

Initial assignments and inter-prison transfers, however, are not at issue here. Instead, we are concerned with transfers within a particular prison. States may, and often do, set forth regulations or engage in practices that give rise to an interest in being assigned to certain sections within a prison. *See Vitek v. Jones,* 445 U.S. 480, 489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980) (states "may grant prisoners liberty interests that invoke due process protections when prisoners are transferred to solitary confinement for disciplinary or administrative reasons); *see also Enomoto v. Wright,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) *aff'g* 462 F.Supp. 397 (N.D.Cal.1976). For example, consider pris-

on regulations or practices that establish a rule that all inmates except death row inmates be placed in the general population. These regulations or practices give rise to a liberty interest protectible by the due process clause. Once a liberty interest is thus created, prison officials may not arbitrarily deny non-death row inmates their places in the general population. Of course, prison officials may freely institute intra-prison transfers as administrative needs dictate so long as the change in the conditions of imprisonment does not affect the inmate's liberty interest in living in the general population. Thus, a transfer from one unit of general population to a comparable unit does not invoke the due process clause.[12]

It is apparent that the determination whether a state has granted inmates a liberty interest in remaining in general population requires an inquiry into the state's statutes, regulations, and practices. Initially, this inquiry must be made at the district level. Even though statutes and regulations are written, an appellate court would have difficulty reviewing a district court determination of whether a liberty interest was created in the absence of a full factual development concerning the practices of the state, for the interaction between written regulations and actual practices often produces results not apparent by a mere examination of the regulations. Moreover, the practices of a state may be determinative, for even if a state by statute or regulation explicitly refuses to grant inmates certain liberty interests, practices of a state may nevertheless give rise to those same liberty interests. In the event a liberty interest is determined to exist, a detailed examination

---

have been confined in disciplinary confinement as long as he was actually held in "administrative" confinement.

11. As suggested above, every state action carrying adverse consequences for prison inmates does not activate a due process right. *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). Of course, other constitutional provisions, such as the Cruel and Unusual Punishment prohibition or the Equal Protection Clause, *see, e. g., Jones v. Diamond,* 636 F.2d 1364, 1373 (5th Cir. 1981), may under the

proper circumstances restrain state action in this area.

12. Similarly, a transfer from one unit of general population to another comparable unit does not normally offend the Eighth Amendment. "If new conditions of confinement are not materially different from those affecting other prisoners, a transfer for the duration of a prisoner's sentence might be completely unobjectionable and well within the authority of the prison administrator." *Hutto v. Finney,* 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978).

of the degree of the change in conditions is necessary to determine what minimum process the state must provide.

In the instant case, the district court made the appropriate inquiries in regard to the practices at GCI. But there was no inquiry into the practices of the State of Florida at its other penal institutions; neither was there inquiry into the change in conditions of imprisonment to which an inmate at other institutions might be subjected. Thus, a factual basis for the district court's statewide order did not exist. Normally we would remand a case such as this to the district court for a full development of relevant facts. In this case, however, remand for a full factual development is inappropriate since plaintiff did not challenge the statewide practices. He challenged only the practices as they affected his transfer at GCI. The district court reached the issue of statewide applicability because it was of the opinion that its finding that the regulations as applied at GCI deprived inmates of due process of law mandated a similar finding statewide. While the regulations, combined with the state practices at other prisons, may produce liberty interests that are protected by the Fourteenth Amendment against arbitrary deprivation, plaintiff did not present this issue to the district court and it was not litigated before the district court. Accordingly, there is no need to remand for litigation on this issue.

The judgment of the district court is AFFIRMED and REMANDED insofar as it affects Glades Correctional Institute and VACATED insofar as it affects the statewide Florida penal system.