Robert **FINNEY**, et al., **Plaintiffs,**

v.

James **MABRY**, et al., **Defendants.**

No. PB–69–C–24.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Dec. 15, 1981.

Philip E. Kaplan, Jack Holt, Jr., Phillip McMath, Little Rock, Ark., for plaintiffs.

Steve Clark, Atty. Gen., A. Carter Hardage, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, Chief Judge.

On September 28, 1981, oral arguments were held in this case after five weeks of trial. At that time, the Court made findings of fact and ruled from the bench on a number of issues raised by the petitioners, inmates of the Arkansas Department of Correction. The Court withheld judgment on other issues pending additional post-trial submissions. In a letter dated October 6, 1981, the Court asked the parties to brief certain issues relating to the policy of administrative segregation in the Arkansas Department of Correction.[1] Those issues are now ready for adjudication.

---

1. Paragraph N of the petitioner's amended complaint states:

"Respondents have failed to secure constitutional conditions in the maximum security facility by . . .; 2. Failure to repair damaged

The Court must decide whether inmates of the Arkansas Department of Correction have a liberty interest, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in remaining free from confinement in administrative segregation. If such a liberty interest is found to exist, then the Court must determine what minimum procedural safeguards are required to safeguard that interest.

In resolving these issues the Court must strike a balance between the constitutional rights of prisoners and the duty of prison administrators to maintain a safe and orderly institutional environment. The court in *Kelly v. Brewer*, 525 F.2d 394, 399 (8th Cir. 1975), stated that in the context of administrative segregation, "it is not the function of federal courts to embroil themselves unduly in matters of prison administration or of the classification of convicts or of prison security. In those areas, much must be left to the discretion of prison administrators and in a given case a federal court should go no further than constitutional necessities require. However, we also recognize that convicts have certain rights that are protected by the Constitution of the United States. The federal courts have both the power and the duty to protect those rights effectively, and, as courts of equity, they have broad discretion in devising appropriate remedies." The Court acknowledges that administrative segregation is necessary in most prisons, and that the decision to separate a prisoner from the general population for purely administrative reasons must be left to the discretionary judgment of prison administrators.

### 1. Due Process Liberty Interest

■ The Due Process Clause of the Fourteenth Amendment applies when state action deprives a person of his liberty. The State of Arkansas may, of course, constitutionally deprive individuals of their freedom when it convicts them of crimes in accordance with constitutional procedures. However, prison inmates themselves remain under the protection of the Constitution and retain certain liberty interests which the state may not abridge without meeting minimum standards of due process. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Parker v. Cook*, 642 F.2d 865 (5th Cir. 1981). The Court must define the extent of those remaining liberty interests when prisoners are faced with separation from the general population for purely administrative reasons.

■ Where state law has created a justifiable expectation that certain inmate privileges will not be taken away absent certain conditions or occurrences, the state has created a constitutionally protected liberty interest with respect thereto. *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) (interprison transfers require a state law foundation for a protected liberty interest); *Williams v. Missouri Board of Probation and Parole*, 661 F.2d 697 (8th Cir. 1981) (inmates have a protected liberty interest rooted in the Missouri law of parole release); *Evans v. Dillahunty*, 662 F.2d 522 (8th Cir. 1981) (federal prisoners have a limited right to parole protected by the Due Process Clause of the Fifth Amendment because of the federal parole statutes); *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (prisoners have a due process liberty interest, rooted in state law, before transfer to a state mental hospital to undergo behavior modification). In *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Calif. 1976), aff'd mem., 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), the California prison regulation on administrative segregation was held to create a constitutionally protected liberty interest. *See also, Helms v. Hewitt*, 655 F.2d 487 (3rd Cir. 1981) (case was remanded to the district court for a determination of whether Pennsylvania

lighting, lavatory and sanitary facilities ...; 5. Failure periodically to reevaluate occupants, including psychological evaluation; 6. Failure to isolate those in administrative segregation from those in punitive isolation; ... 8. Failure to insure that administrative segregation will not be imposed without due process."

prison regulations on administrative segregation give rise to due process protections).

Where there is no foundation in state law restricting the discretion of prison officials to transfer inmates to administrative segregation, the federal courts have routinely held that no liberty interest exists. *Four Certain Unnamed Inmates of Massachusetts v. Hall*, 550 F.2d 1291 (1st Cir. 1977); *Bills v. Henderson*, 631 F.2d 1287 (6th Cir. 1980); *Arsberry v. Sielaff*, 586 F.2d 37 (7th Cir. 1978). What constitutes a foundation in state law, however, has been given a broad interpretation. Prison regulations, prison directives, and even standard prison practices have been held to create justifiable expectations that liberty will not be curtailed absent certain conditions. *See, e.g., Hoss v. Cuyler*, 452 F.Supp. 256 (E.D. Pa.1978) (administrative prison directive created liberty interest); *Lamb v. Hutto*, 467 F.Supp. 562 (E.D.Va.1979) (standard practice to conduct pre-transfer hearings created a liberty interest).

 The Court concludes that the Arkansas prison regulations guarantee that inmates will not be confined in administrative segregation without certain minimum due process protections. Administrative Regulation § 836 of the Arkansas Department of Correction (Respondent's Exhibit No. 81–49) provides in pertinent part:

> Inmates may be placed in a segregation classification by the Institutional Classification Committee by a majority vote of the Committee after a hearing at which the inmates must be given an opportunity to appear before and address said Committee and if the inmates:
>
> 1. Indicate a chronic inability to adjust in the general population.
>
> 2. Constitute a serious threat to the security of the Institution.
>
> 3. Require maximum protection from themselves or if others require maximum protection from them.

This regulation creates an expectation in the inmates that they will not be confined in administrative segregation unless one of the above three conditions exists. Once created, this liberty interest is protected against arbitrary deprivation by the Due Process Clause.

The Arkansas regulation is substantially similar to the California regulation held by the court in *Wright, supra*, to create a protected liberty interest. That regulation provides, in pertinent part, that " 'inmates must be segregated from others when it is reasonably believed that they are a menace to themselves and others or a threat to the security of the institution.' " 462 F.Supp. at 402. The rules governing administrative segregation in the Texas Department of Correction, similar to the Arkansas and California regulations, were also held to trigger due process guarantees. *Ruiz v. Estelle*, 503 F.Supp. 1265, 1365 (S.D.Tex.1980).

In holding that this regulation creates an interest entitled procedural due process protection, the Court need not reach the issue, raised by petitioners at trial and in oral argument, of the effect of certain guarantees in the inmate handbook, the history of which, and the proper interpretation, is very confusing. Once a liberty interest is found to exist, minimum constitutional standards of due process apply regardless of the source of that interest.

In finding a constitutionally protected liberty interest, the Court need not rely on the "grievous loss" theory advanced by the petitioners (i.e., that the more onerous conditions in administrative segregation might, *ipso facto*, give rise to the protection of the Due Process Clause). Neither petitioners nor respondents dispute that state laws and regulations may create protected liberty interests. Given Arkansas prison regulation § 836, minimum procedural safeguards must be afforded. To decide that the more onerous conditions are also a source for the requirement of procedural due process would be an unnecessary holding. If minimum procedural protections are afforded, it is once again unnecessary to pinpoint the source of those requirements.

Furthermore, the current status of the "grievous loss" theory in the context of administrative segregation is uncertain. Although there is strong language in

*Wright, supra,* supporting the view that an "impairment of the residuum of liberty" retained by the prisoner triggers due process guarantees, that language is no more than dictum given the court's ultimate reliance on California prison regulations. 462 F.Supp. at 402. In addition, a number of cases after *Wright* cast substantial doubt on the continued vitality of that theory. *See, e.g., Vitek v. Jones, supra,* 445 U.S. at 489, 100 S.Ct. at 1261, where the Court cites *Wright* only for its state law holding despite discussing the "grievous loss" theory at length; and *Helms v. Hewitt, supra,* where the Third Circuit interpreted the *Vitek* Court's citation of *Wright* as ending the "grievous loss" theory in administration segregation. *See also, Bills v. Henderson,* 631 F.2d 1287, 1293 (6th Cir. 1980). "When prison officials have complete discretion in making a decision that will affect the inmate, no expectation or protected liberty interest has been created." *Wright* was interpreted by the Sixth Circuit as a case in which the prison regulations sufficiently limited discretion to create a liberty interest. In *Mitchell v. Hicks,* 614 F.2d 1016 (5th Cir. 1980), *Wright* was restricted to the holding of state created liberty interests. A "transferred prisoner . . . must demonstrate that the liberty interest upon which he bases his claim is a creation of state law." 614 F.2d at 1019. *But see, Brown v. Neagle,* 486 F.Supp. 364, 367 (S.D.W.Va. 1979), where the court cited *Wright,* and held that federal prisoners transferred to administrative segregation are entitled to the same protections as those afforded in discipline cases, "particularly where, as here, the affected prisoner suffers a loss of liberty much more severe than that suffered by the general population."

Although the "grievous loss" theory has not generally found favor with the courts, it is nevertheless always important to compare the differences in the conditions of punitive segregation with the conditions of administrative segregation in cases such as this. Administrative segregation must be for legitimate administrative reasons and not directly, or indirectly, for purposes of punishment. As noted by the court in *Parker v. Cook,* 642 F.2d 865, 875 (5th Cir. 1981), a state cannot escape due process requirements by attaching the label of administrative segregation to what is otherwise disciplinary action. Where the conditions of administrative segregation are substantially less onerous than punitive segregation, however, the argument that "adseg" is being used for punitive purposes will not be nearly as persuasive as when the conditions of confinement in the two situations are essentially the same.

In the Arkansas system the conditions of administrative segregation are significantly different from those for punitive segregation. The evidence at trial indicated that, in a number of respects, the restrictions imposed upon inmates confined in the East Building for punitive reasons were considerably more severe than those imposed on inmates confined for administrative purposes.

It is also important in cases such as this to compare the difference in the status of prisoners administratively segregated with the status of inmates in the general population. Respondents have set forth those differences in their brief using the following chart:

Analysis of Conditions and Restrictions in Segregation vs. General Population.

| Condition/ Privilege | General Population | Segregation |
|---|---|---|
| Dining | Common dining hall. | In cell (subject to change upon implementation of work assignments). Same food—same portions. |

Analysis of Conditions and Restrictions in
Segregation vs. General Population.

| Condition/ Privilege | General Population | Segregation |
|---|---|---|
| Exercise | Indoor/outside, weather permitting. Regularly scheduled and supervised. | Indoor/outside, weather permitting. Regularly scheduled and supervised. 3 hours per week. |
| Showers | As desired. | Policy = 2 per week. Practice = 3 per week. |
| Library | Free access during scheduled hours. | May request books and have them delivered to cell. |
| Plasma Center | May participate. | Participation not allowed. |
| Visitation | Weekly for class I. Every other week for classes II—IV. Saturday or Sunday. | Weekly for class I. Every other week for classes II—IV. Tuesday or Wednesday. |
| Radio | Allowed. | Allowed. |
| Television | In barracks at scheduled times. | In dayroom—schedule provided —3 hours per week in addition to exercise time which may be used for T.V. |
| Mail | Full mail privileges—legal-personal-religious. | Same. |
| Religious Services | Group services. | No group services—May receive individual visits from chaplain. |
| Medical | Daily sick call. | Same. |
| Commissary | Free access to all items listed for sale. | May request any item listed— delivered to cell on same day. |
| Group Activities | Weekly movie; Gym; Exercise. | No large group activity. |
| Personal Property | May possess non-contraband items. | Same. |
| Good Time | Earn in accordance with classification. | Same. |
| Vocational Training | Courses available to qualified applicants. | None. |
| Work—Job Assignments | Required. | Not presently required. Enforcement of policy will require. |
| Tobacco | Purchase allowed; provided for indigents. | Same. |
| Counseling | Available. | Available—full time East Building counselor. |
| School | If below certain level, required. Further attendance voluntary. | Available 3 days per week. |
| Mattress | In cell 24 hrs. per day. | Same. |
| Clothing | State issued. | Same as general population. |
| Personal Hygiene Items | Necessities provided—others available for purchase. | Same. |

To summarize, inmates in administrative segregation lose certain rights and privileges enjoyed by prisoners in the general population. "The most prominent restrictions imposed upon those inmates ... are the increased restrictions upon movement and a limit upon group type activities" (respondent's post hearing brief). The Court considers the above restrictions serious, but commensurate with valid correctional and administrative goals. Confinement to any form of maximum security necessarily entails restrictions on associational activities.

A number of other conditions of confinement require a separate analysis. According to testimony at trial, inmates confined to administrative segregation were denied the job assignments given to inmates in the general population, and were thus denied the opportunity to accumulate good time credit. The respondents state in their post hearing brief "that the Director is preparing to enforce the policy which provides for the assignment of inmates housed in the maximum security area of a particular unit of the Arkansas Department of Correction to job assignments in the same manner as the general population of that unit. The policy will provide a greater opportunity for inmates housed in the maximum security area to move up in class and therefore earn more 'good time' credit." The Court views this proposed modification as a very important, indeed significant, change. Accordingly, the respondents should advise the Court by way of a status report on the actions of the Arkansas Department of Correction in implementing this policy.

■ There was also evidence at trial that inmates in administrative segregation were sometimes celled with inmates on "punitive." The petitioners urge in their post hearing brief that "this poses a serious danger to the safety of these inmates." The Court agrees, and apparently respondents do also. Inmates in administrative segregation are isolated for reasons different than those relied on to isolate prisoners in puni-

tive segregation. One of the administrative reasons is the protection of the inmate himself. Obviously housing the two groups together may defeat that very purpose. The Court can find no valid correctional purpose which is served by this practice. In order to prevent the reoccurrence of such incidents, it will be ordered that inmates confined to administrative segregation be housed in different cells than those confined to punitive segregation except where emergency conditions permit of no reasonable alternative. Such emergencies shall be documented carefully and terminated at the earliest practicable time. The A.D.C. is hereby directed to take whatever steps are necessary to implement this Order. The respondents' status report should include a statement of the steps which have been taken to comply with the Court's directive.

### 2. Minimum Standard of Procedural Due Process

Once satisfied that a liberty interest exists, the Court must determine what process is due in the particular context. The current Arkansas procedure for administratively segregating an inmate is outlined in Administrative Regulation § 836 and described in the respondents' post-hearing brief. The decision must be made by a majority vote of the Institutional Classification Committee, and must be based on the three factors set out in § 836. The inmate must be given an opportunity to "appear before and address" the Committee. The Committee must review the inmate's master folder and "all decisions must be reduced to writing along with the basis for the decision." The decision "may be subject to review" by the Chief Administrative Officer. The Committee must review the inmates' status every 60 days,[2] with an annual review by the warden.

■ Due process is not a concept with a prescribed content unrelated to individual conditions and circumstances; rather it is flexible and calls for such procedural pro-

---

**2.** Respondents point out that there is a new form for the 60-day reevaluation. This form contains the reasons for the initial assignment, the inmate's statement, the committee's comments (including the result of psychological evaluations), and the committee's decision.

tection as the particular situation demands. *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Hence, an analysis of what process is due in the administrative segregation decision must take into consideration the particular factual situation, including the onerousness of the conditions and restrictions imposed. *Parker v. Cook, supra*, 642 F.2d at 876–7. As the Court has noted above, the conditions of confinement for inmates in administrative segregation, as practiced and as currently proposed by respondents, are not as restrictive as those imposed on inmates in punitive isolation. The Supreme Court has delineated the due process requirements for confinement for disciplinary reasons. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), establishes that the prisoner must be given: (1) an opportunity to appear before the Committee; (2) written notice of the charge prior to the hearing; (3) an opportunity to present witnesses and documentary evidence; (4) a written statement of the reasons for the decision and the evidence on which it is based; and (5) counsel substitute where the inmate is illiterate or the issues are complex. *Wright* held that the minimum disciplinary standards of *Wolff* should be applied to administrative segregation decisions as well. That was also the holding in *Ruiz v. Estelle, supra.*

The petitioners urge the Court to apply even more stringent procedural safeguards to the administrative decisions than apply to confinement for disciplinary reasons because administrative segregation, unlike punitive, may be imposed for an indefinite period of time. Additionally, as noted by the court in *Wright,* the charges at a disciplinary hearing are definite and narrow, while the charges resulting in administrative confinement are usually vague. *Wright,* however, refused to expand the due process requirements of *Wolff* in an administrative context, noting that there was insufficient evidence before the Court on the effect such procedures would have on prison administration. 462 F.Supp. at 404. This Court takes a similar approach. In addition, because conditions in administrative segregation are less onerous than those in punitive segregation, the Court would not be justified in requiring more stringent standards than those delineated in *Wolff.* Indeed, even some slight lessening of the *Wolff* standards would seem appropriate here.

■ The respondents have submitted proposed changes in the procedure outlined in Administrative Regulation § 836. Subject to Board approval, the additional procedures would be: (1) written notice of the charges 24 hours prior to the Institutional Classification Committee hearing; (2) the opportunity to present evidence at the hearing; [3] (3) a written decision, including the *basis* of the decision; [4] and (4) a review by the Committee within 72 hours of an emergency segregation by the shift supervisor.

■ The Court concludes that the addition of these proposals, if approved by the Board, would result in procedures which will meet minimum constitutional standards of procedural due process if the Board also adopts its proposed job assignment-good time rules for those on administrative segregation. The changes comply with the standards enunciated in *Wolff, supra,* except for the mandatory provision for counsel substitutes in certain cases. The *Wolff* standard, however, clearly stops short of requiring legal assistance in all disciplinary hearings. The Supreme Court notes:

The insertion of counsel into the disciplinary process would inevitably give the

---

**3.** The procedure currently in effect allows an inmate to appear before and address the Committee, but contains no provision for the presentation of evidence.

**4.** Although Administrative Regulation § 836 currently requires the basis for the decision to

be in writing, the evidence at trial indicated that this requirement is often ignored. Accordingly, the Court treats this as a proposed change in the procedure which must be independently approved by the Board.

proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.

Where an illiterate inmate is involved, however, or where the complexity of the issues makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or ... to have adequate substitute aid in the form of help from the staff.

418 U.S. at 570, 94 S.Ct. at 2981–82.

In the context of an administrative segregation hearing, the justification for a counsel substitute is less compelling than in a disciplinary hearing, which has a number of characteristics of a criminal proceeding. This is particularly true where, as here, the restrictions in administrative segregation are less severe. In any event, the Court does not deem it necessary to *require* legal assistance. The inmate is to be given 24 hours written notice of the hearing. If the prisoner desires to seek the help of a more experienced or literate inmate, there is nothing preventing him from doing so. And it is clear that the Institutional Classification Committee would not ·prevent the inmate from utilizing such assistance if requested by, and obtained by, the inmate.

The Court must now determine how best to insure that the proposed changes are put into effect. The respondents are directed to file a status report with the Court no later than January 15, 1982. At that time, they should inform the Court and the petitioners what action the Board has taken on the proposed changes. The petitioners will then be given until January 30, 1982, within which to comment thereon. The status report shall include a statement by the respondents on all actions taken to implement the orders of the Court. After receiving the submissions of the parties, the Court will enter its final order on all issues relating to administrative segregation.