Richard FLOWERS, Plaintiff,

v.

Thomas COUGHLIN, III, Commissioner; C.E. DuFrain; W.F. Barkley; Arthur Leonardo; Ron Haddad and E.S. LeFevre, Defendants.

No. 82–CV–104.

United States District Court,
N.D. New York.

Nov. 22, 1982.

Prisoners' Legal Services of New York, Plattsburgh, N.Y., for plaintiff; Robert A. Kagan, David C. Leven, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; David B. Roberts, Asst. Atty. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

JAMES T. FOLEY, Senior District Judge.

By Memorandum-Decision and Order dated January 29, 1982, I directed the filing and service of the pro se civil rights complaint in this action. Plaintiff, an inmate at Clinton Correctional Facility, Dannemora, New York, seeks damages and injunctive relief from the defendants for his involuntary placement and continued confinement in the Assessment and Program Preparation Unit at Clinton. After filing and service of the complaint herein, in which plaintiff alleges violations of his Sixth, Eighth, Thirteenth and Fourteenth Amendment rights, plaintiff moved for a temporary restraining order, preliminary injunction and summary judgment. Defendants filed a cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) before filing an answer.

Prisoners' Legal Services of New York, Plattsburgh Office, now represents the plaintiff in this matter and has filed opposition to defendants' motion for summary judgment. As noted in his opposition, plaintiff's request for a temporary restraining order and preliminary injunction, as well as his motion for summary judgment have been withdrawn. Therefore, presently before the court is only defendants' motion for summary judgment.

For the reasons stated hereinafter, defendants' motion for summary judgment is denied in relation to plaintiff's claim in the complaint based upon the Fourteenth Amendment due process clause and is granted in relation to the claims in the complaint based upon alleged violation of rights under the Sixth, Eighth and Thirteenth Amendments.

### FACTS

Plaintiff is presently in the Assessment and Program Preparation Unit (APPU) at Clinton Correctional Facility. Subsequent to his placement in the APPU at Clinton, the plaintiff was in protective custody at Green Haven Correctional Facility. He was placed in protective custody on February 1, 1981 after a fire was started in his cell. On February 13, 1981, he was given a Superintendent's Proceeding at Green Haven in accordance with the New York Code of Rules and Regulations § 253 (N.Y.C.R.R.) in which it was determined that there was substantial evidence to hold him in involuntary protective custody. He remained in protective custody at Green Haven until June 19, 1981 at which time he was transferred to the APPU at Clinton. Before being transferred from protective custody to the APPU, the plaintiff was not afforded any type of hearing and he has not been afforded any type of review to determine the necessity of his continuation in the APPU. The memorandum of law submitted by the Attorney General, without any detail, states only that the transfer into the APPU program was accomplished by the Office of Classification and Movement in Albany.

Plaintiff contends that he was entitled to a hearing before being involuntarily placed in the APPU, and that defendants should be restrained "from forcing plaintiff to participate in 'APPU' programming; or placing him in limited program confinement for declining to participate in programs." He claims that his due process rights were violated by his involuntary placement in APPU and by his continued commitment in the program; rather than being released into the general population.

Defendants', on the other hand, contend that plaintiff is not entitled to any due process protections in regard to his placement in APPU. They urge that the APPU is a diagnostic and treatment center as defined in the N.Y. Corrections Law § 2(9) and that admission into the program is governed by the N.Y.C.R.R. § 304.1(a)(1) which provides for automatic admissions into a diagnostic and treatment center, as distinguished from protective custody which requires a hearing. It is claimed that since plaintiff and all other inmates in the APPU would have no expectation from the prison regulations that transfers to the program will be accompanied by hearing, that there-

fore no liberty interest is involved. Additionally, defendants claim that APPU inmates enjoy most, if not all, of the privileges enjoyed by inmates in the general population at least to such extent that any due process requirements are met. Finally, the contention for the defendants is that the Supreme Court cases of *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) are controlling.

■ It is important to note that it is undisputed that the plaintiff did receive an appropriate due process hearing at Green Haven before being confined in involuntary protective custody and it was thereafter that he was sent to the APPU at Clinton. If plaintiff is entitled to any due process protections before being confined in APPU, as he contends, then these have been satisfied by the Superintendent's Proceeding which determined the need to separate him from the general population. *See Ashley v. Coughlin,* 81–CV–716 (N.D.N.Y.1981). However, plaintiff has not received any type of review as to his continued confinement in the program. It is this alleged violation of his due process rights that the court will consider herein.

In order to understand the positions of the parties, it is necessary to set forth the pertinent statutes and regulations upon which they rely and upon which the APPU has been developed. The APPU as previously mentioned, has been deemed to be a "diagnostic and treatment center" as defined in N.Y. Corrections Law § 2(9) as:

> [a] correctional facility operated for the purpose of providing intensive physical, mental and sociological diagnostic and treatment services including pre-parole diagnostic evaluation, . . . and scientific study of the social and mental aspects of the causes of crime.

Under N.Y.C.R.R. § 304.1(a)(1), an inmate can be automatically admitted to confinement in a special housing unit used as a reception center, detention center or a diagnostic and treatment center. Therefore, the defendants contend that since admission to APPU is automatic no hearings are necessary in order to satisfy due process.

Under 7 N.Y.C.R.R. 304.1(b), an inmate may be placed in protective custody " . . . in the case of *inmates who are potential victims,* or are witnesses likely to be intimidated or lack the strength to live in the general institutional community, or must, for good cause, be restricted from communication with the general inmate population." (Emphasis added). *See also* 7 N.Y.C.R.R. § 300.3(b)(3). An admission to protective custody can be made "where there is substantial evidence that such action is necessary", unless the inmate voluntarily admits himself. 7 N.Y.C.R.R. § 304.3(a). An inmate involuntarily admitted to protective custody, as well as inmates who are in protective custody and request reassignment to a different unit, must be given a hearing within fourteen (14) days of their admission or request to transfer. 7 N.Y.C.R.R. § 304.3(c). The hearing, conducted pursuant to 7 N.Y.C.R.R. § 253, is "to determine if there is substantial evidence that protective custody is necessary." *Id.*

It is plaintiff's main argument that although the APPU has been deemed a diagnostic and treatment center, there is a clear factual dispute whether it is in practice a protective custody unit. It is claimed by plaintiff that the same purpose and goal underlies both protective custody and the APPU. The objective of the APPU, as stated in defendants' Exhibit B is

> [t]o provide a separate program for those inmates *unable to function in general population* for fear of verbal and physical confrontation with other inmates which periodically occur in general population; and, provide psychological support to assist the inmate. To prepare for eventual return to general confinement (sic). (Emphasis added).

The target population that APPU is aimed at are inmates who demonstrate:

> an inability to function in general population due to real or imagined fear of physical and/or verbal confrontation, harassment or pressures from other inmates.

In his affidavit, plaintiff claims that while in the APPU, he has not received any psychological, educational or vocational testing. Additionally, he claims that he has not received any therapy, treatment or other services in APPU, although he works on handicrafts for three and one-half hours per day. He states that he has "strenuously objected" to his confinement in APPU and that he believes that he could safely function in the general inmate population.

Charles DuFrain, the Supervisor of the APPU, states in his affidavits that many of the inmates served by the APPU would be in protective custody if the program did not exist and that the APPU was designed to increase program opportunities for those inmates. He states that the program provides a wide array of programming, recreational, and educational opportunities. He further states that the APPU is a "laudable effort by the Department of Correctional Services to provide comprehensive programming to inmates who have encountered severe difficulties in coping with life in the general population of the facility."

The memorandum of law of the Attorney General (p. 6) describes the APPU program and its difference from protective custody in this manner:

Mr. Flowers was confined 23 hours per day in protection at Green Haven until his transfer to the APPU on June 19, 1981.

Conditions of confinement in APPU stand in marked contrast with those traditionally ascribed to protection units. As is detailed in Charles Dufrain's affidavit dated April 16, 1982, inmates in the APPU program are locked in their cells only 12 hours per day. The inmates eat their meals in the mess hall, rather than in their cells; they participate in a wide range of programs; they enjoy regular and frequent opportunities to utilize the facility gymnasium; they participate in congregate religious services; they go to movies; they participate in the phone home program and family picnics; they have access to a legal and nonlegal lending libraries, as well as the facility commissary. In short, every facet of the APPU program is designed to provide parallel, if not equal, opportunities to so-called "protection" inmates as are provided to those in general population. This is an innovative and well-intentioned program which has been well received by the vast majority of inmates who presently participate in the program.

## DISCUSSION

Summary judgment is a drastic remedy which should be granted only when there is a clear showing "that here is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment can only be used when " . . . it is quite clear what the truth is [and] that no genuine issues remain for trial." *Sartor v. Arkansas National Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). All ambiguities should be resolved and all inferences should be drawn from the underlying facts in the light most favorable to the party opposing the motion. *United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor"*, 691 F.2d 603 at 606 (2d Cir.1982), *citing United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). A dual burden is placed upon the movant to demonstrate that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

It also has been stated that where an infringement of a constitutionally protected interest in "liberty" is alleged, as in the present case, it is essential that a litigant be afforded a reasonable opportunity to prove facts which, taken together, state a claim. *Quinn v. Syracuse Model Neighborhood Corp., supra,* 613 F.2d at 442. "Summary dismissal of alleged Fourteenth Amendment violations based on deprivations of this interest, therefore, is appropriate only when prior case law leaves no doubts that

the defendant must prevail as matter of law". *Id.*

In the present case, in order for the plaintiff to prevail on his due process claim under 42 U.S.C. § 1983, he must allege and prove a deprivation of a liberty interest. *Board of Education v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The liberty interest protected by the Fourteenth Amendment is broad. *Id.,* at 572, 92 S.Ct., at 2706. It is well settled that a convicted prisoner is not protected by the due process clause, in and of itself, from transfer from one institution to another. *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Montayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) (prisoner has no right to remain at any particular prison facility and no justifiable expectation that he would not be transferred). However, a prisoner may have a protected liberty interest when it is created by state law. *See, e.g., Vitek v. Jones,* 445 U.S. 480, 488–91, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980) (creation of liberty interest of inmate in not being transferred to a mental hospital based on statute); *Wright v. Enomoto,* 462 F.Supp. 397 (N.D.Cal.1976), *summarily aff'd,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) (administrative regulations created a liberty interest before inmate could be confined in maximum security); *Wolff v. McDonnell,* 418 U.S. 539, 556–57, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974) (creation of liberty interest in good time credits based on statute). Prison guidelines on administrative segregation have also been held to have created liberty interests. *See Parker v. Cook,* 642 F.2d 865 (5th Cir.1981); *Bills v. Henderson,* 631 F.2d 1287 (6th Cir. 1980). *Contra, Gorham v. Hutto,* 667 F.2d 1146 (4th Cir.1981).

In *Vitek v. Jones, supra,* the Supreme Court held that the state had created a liberty interest by a statute which restricted transfer of inmates to mental hospitals to only those cases in which a "prisoner suffers from a mental disease or defect 'that cannot be given proper treatment' in prison." 445 U.S. at 489–90, 100 S.Ct. at 1261–62. The statute had created an expec-

tation in the prisoner that he would not be transferred unless upon the occurrence of the specified behavior. Thus, "the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed." *Id.,* at 491, 100 S.Ct. at 1262, *citing Wolff v. McDonnell, supra,* 418 U.S. at 558, 94 S.Ct. at 2975. The court recognized that it was essential that the inmate have an opportunity to prove that he did not have a mental disease or defect that could not be treated in prison before suffering the stigmatizing effects of transfer to a mental institution.

In *Wright v. Enomoto, supra,* the court held that due process should have been afforded California inmates who were transferred for administrative reasons from the general population to maximum security within the same prison. Since the state had fixed the conditions for segregation, it had created a protected liberty interest. 462 F.Supp. at 403. The court found that it was essential to allow the inmate a chance to prove that he did not represent a risk to the security of the prison, the set standard, before being transferred to administrative segregation.

After the cases of *Wright* and *Vitek,* it seems clear that "once the state by either statute or rule confers a protectable liberty interest in not being confined in restrictive custody, that interest may not be infringed without affording him the minimal procedural safeguards appropriate to the circumstances ..." *Helms v. Hewitt,* 655 F.2d 487, 503 (3rd Cir.1981), *cert. granted,* 455 U.S. 999, 102 S.Ct. 1629, 71 L.Ed.2d 865 (1982). It becomes necessary to meet due process requirements when a "state grants a prisoner a right or expectation that adverse action will not be taken against him except upon the occurrences of specified behavior." *Vitek v. Jones, supra,* at 490, 100 S.Ct. at 1262.

In the present case, in my judgment, there are questions of fact which preclude the granting of summary judgment for the

defendants. There are questions as to exactly how the APPU is functioning in regard to plaintiff. It does appear that the purpose behind protective custody and the APPU is similar—protecting prisoners unable to function in the general population. Furthermore, an issue remains as to whether the APPU is providing plaintiff with the "intensive physical, mental and sociological diagnostic and treatment services", N.Y. Corr.L. § 2(9), necessary for it to be considered as a diagnostic and treatment center.

If the APPU is in practice a protective custody unit, the state cannot change the due process protections available to the prisoner merely by attaching a different label. *See Wright v. Enomoto, supra,* 462 F.Supp. at 402 (three judge court) ("When a prisoner is transferred from the general prison population to the grossly more onerous conditions of maximum security, be it for disciplinary or for administrative reasons, there is a severe impairment of the residuum of liberty which he retains as a prisoner—an impairment which triggers the requirement for due process safeguards.") If the state has granted a prisoner a liberty interest in being free from arbitrary transfers to protective custody, then a liberty interest is created in the APPU if it functions as a protective custody unit, regardless of what the state chooses to call it, and the plaintiff should be given an opportunity to prove that he will be able "to function in the general population." *Parker v. Cook, supra,* at 875.

Defendants contend that conditions in APPU are much better than in protective custody and that APPU inmates enjoy most of the privileges enjoyed by inmates in the general population. However, certainly from the plaintiff's point of view, the APPU is less desirable than the general population, and it is claimed it has stigma attached to it by the general population inmates. Moreover, it is clear that when determining whether a person is entitled to due process protections, it is the nature of the interest that is determinative, rather than its weight. *Meachum v. Fano, supra,* 427 U.S. at 224, 96 S.Ct. at 2538; *Board of*

*Education v. Roth, supra,* 408 U.S. at 570–71, 92 S.Ct. at 2705–06; *Bills v. Henderson, supra,* 631 F.2d at 1291–92. Although conditions are less onerous in APPU, if in fact it functions as protective custody, plaintiff may be entitled to some due process protection during his exclusion from the general population.

This court is certainly aware and has so ruled often that federal courts should not sit to supervise state prisons and that the court's inquiry into prison management must be limited to the issue of whether a particular system violates any prohibition in the Constitution. *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979); *see Frazier v. Ward,* 426 F.Supp. 1354 (N.D.N.Y.1977). Certainly the court is reluctant to involve itself in the day-to-day operation of the APPU which is probably a program designed with good intentions and for laudable purposes, and which may be benefiting many inmates. *See Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981); *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1979). However, plaintiff may be entitled to some due process protections if he can show that the state has created a liberty interest in not being confined in APPU without the opportunity to refute the need for it.

Defendants' are entitled to judgment as a matter of law on the Sixth, Eighth, and Thirteenth Amendment claims which from the submissions are not greatly relied upon by plaintiff. It is clear that the Sixth and Thirteenth Amendments are inapplicable. It is also clear from the submissions that the conditions in APPU are not "so foul, so inhuman and so violative of basic concepts of decency" that would violate the Eighth Amendment proscription against cruel and unusual punishment. *Wright v. McMann,* 387 F.2d 519 (2d Cir.1967), *on remand,* 321 F.Supp. 127 (N.D.N.Y.), *aff'd in part, rev'd in part,* 460 F.2d 126, *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). *See Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57

L.Ed.2d 522 (1978); *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir.), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1971).

For the above stated reasons, defendants' motion for summary judgment is granted to the extent outlined above, and denied in relation to the claim based upon the due process clause of the Fourteenth Amendment.

It is so Ordered.