**Ralph Ratton HALL, and all those similarly situated,
Appellant-Cross-Appellee,**

**v.**

**UNKNOWN NAMED AGENTS OF the NEW YORK STATE DEPARTMENT FOR CORRECTIONAL SERVICES FOR APPU UNIT AT CLINTON PRISON and Eugene LeFevre, Superintendent of Clinton Correctional Facility, Appellees,**

**Eugene LeFevre,
Appellee-Cross-Appellant.**

**Nos. 1100, 1126, Dockets 86–2440, 86–2456.**

United States Court of Appeals, Second Circuit.

Submitted May 6, 1987.

Decided July 29, 1987.

Ralph Ratton Hall, pro se.

Robert Abrams, Atty. Gen., of State of N.Y. (Peter H. Schiff, Deputy Sol. Gen., Nancy A. Spiegel, Asst. Atty. Gen., Martin A. Hotvet, Asst. Atty. Gen., Albany, N.Y., of counsel), for appellee-cross-appellant.

Before OAKES, NEWMAN and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

This appeal, brought by a New York State prison inmate, Ralph Ratton Hall, and a cross-appeal by the State, brings to us the issue whether due process rights are implicated by an inmate's transfer from voluntary protective custody in the Clinton Correctional Facility to the facility's Assessment Program and Preparation Unit ("APPU" or "the Unit"). The United States District Court for the Northern District of New York, Howard G. Munson, Chief Judge, after a bench trial, found for Hall on his due process claim under 42 U.S.C. § 1983 and struck entries of misconduct appearing on Hall's record relating to incidents that occurred during his stay in the APPU. The court held that Hall should receive no damages because the events that led to the suit occurred prior to *Flowers v. Coughlin*, 551 F.Supp. 911 (N.D.N.Y.1982), which the district court relied upon in making its determination, so that the defendants had not, at the time of Hall's transfer to the APPU, violated "clearly defined constitutional rights." 647 F.Supp. 136 (D.C.Pa.1985). *See Deane v. Dunbar*, 777 F.2d 871, 877 (2d Cir.1985).

We hold, however, that the appellant's "liberty interests" were not impaired by his placement in the APPU. *Cf. Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984) (holding that because no substantive limitations were imposed by New York statutes or regulations on the discretion of prison officials to place inmates in reclassification units for nonpunitive reasons, "no liberty interest was implicated"). We therefore reverse the district court's holding that Hall's due process rights were violated by his transfer to the APPU, and that entries of misconduct relating to the period he was confined in the APPU must be struck from Hall's records. The appeal, seeking damages, is accordingly affirmed.

Appellant Hall is a prison inmate serving a life sentence in the New York State Department of Correctional Services. On February 15, 1980, at the Clinton Correctional Facility, he requested to be placed in voluntary protective custody. While in voluntary protective custody Hall was held in a Special Housing Unit secluded from the general prison population, and was locked in his cell for twenty-three hours a day. At the time of placement, he signed a form acknowledging that he could "at any time make a written request to the superintendent for reassignment to the general population and ... will be reassigned within two weeks from the date such request is made unless there is substantial evidence that continuation of protective custody in a special housing unit is necessary." He made no such request.

The Office of Classification and Movement subsequently approved Hall's transfer to the APPU. Appropriate candidates for APPU are identified by facility counselors who submit the transfer requests to the Office of Classification and Movement in Albany, New York. The APPU, which had begun operation only a few months before Hall's transfer on April 23, 1981, offers a "diagnostic and treatment program" to help victim-prone or fearful individuals develop inner strength and coping skills so as to be able to move back into the general population. The Unit has a variety of programs available to inmates, including an academic program, psychological counsel-ing, and three vocational shops. An inmate in the APPU who accepts his program is out of his cell from 8:00 a.m. until 8:00 p.m. On May 1, 1981, Hall refused to accept an assignment to an APPU program. It was made clear to him that if he would not participate in the proffered program the only alternative was a limited privileges program which kept him in his cell for twenty-three hours each day, allowed him two showers a week, and limited visiting and correspondence rights, conditions roughly equivalent to those of protective custody. Prisoners were warned that refusal to accept the assigned program might also "cause loss of good time," and that "when your Good Behavior Allowance is considered, the Time Allowance Committee considers your entire institutional experiences, including good behavior, efficient and willing performance of duties assigned, progress and achievement in Assignment Program."

Hall challenged the APPU program in the district court as a behavior-control, experimental program in which prisoners are submitted to chemical and stress-tolerance experiments. He submitted no evidence on this score, however, and does not pursue that claim here. He also claimed that the APPU was used as an alternative to involuntary protective custody, but without the process due in the case of involuntary confinement. In response to that claim, the state defendants produced evidence from a former APPU supervisor who explained the procedures followed to transfer an inmate into the APPU. The district court found, however, that the state defendants failed to show that there was any indication that Hall had any of the traits or difficulties the APPU is geared to address or that Hall had been submitted to the battery of tests required in the APPU program to determine the inmate's needs. The court analogized placement in the Unit to involuntary protective custody, where inmates are entitled to a hearing within two weeks after such placement, and went on to hold, following *Flowers v. Coughlin, supra,* that by distinguishing the procedures pertinent to voluntary and involuntary protective

custody, the state had created a liberty interest. The court followed the reasoning in *Flowers* that

> [i]f the state has granted a prisoner a liberty interest in being free from arbitrary transfers to protective custody, then a liberty interest is created in the APPU if it functions as a protective custody unit, regardless of what the state chooses to call it, and the plaintiff should be given an opportunity to prove that he will be able "to function in the general population."

551 F.Supp. at 916, quoting *Parker v. Cook*, 642 F.2d 865, 875 (5th Cir. Unit B 1981). The district court further held that besides the entitlement not to be secluded without a showing of need, the APPU classification procedure itself created an entitlement in that inmates had to be found in need of assistance to adapt to the general population and were to be subject to a battery of tests to determine their particular needs. The court held that "even if APPU reflects a benign purpose ... inmates have or may have a very strong interest in not being unduly identified as in need of APPU services" and thus stigmatized. We cannot agree with this reasoning.

Hall's original complaint related to the period from February 1980 until August 11, 1981, when he was transferred to Great Meadow Correctional Facility, pursuant to his May 1, 1981, request for release from protective custody in the APPU. As the district court found, however, Hall was in voluntary protective custody from February 15, 1980, until April 23, 1981, when he was transferred to the APPU. He obviously can have no complaint as to voluntary protective custody since he acknowledged that he could "at any time make a written request to the superintendent for reassignment to the general population" and knew that he would be "reassigned within two weeks" unless there was "substantial evidence" that continuation of protective custody was necessary, and he made no such request. We therefore address only Hall's transfer from voluntary protective custody to the APPU.

The United States Constitution itself does not create any protected liberty interest in remaining in the general prison population, for "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983) (quoting *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)).

We are required then to look at the New York statutes and prison regulations at issue to determine whether they created an entitlement in a prison inmate already in voluntary protective custody not to be transferred to the APPU without various procedural protections constituting due process. Unlike the Pennsylvania statutes and prison regulations in *Hewitt v. Helms*, see 459 U.S. at 471–72, 103 S.Ct. at 871–72, but like the statutes and regulations relative to administrative confinement in *Sher v. Coughlin*, 739 F.2d at 81, the statutes and regulations here involved do not indicate that particularized standards or criteria guide the state's decisionmakers. *See Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). Here there is no "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance,'" *Hewitt v. Helms*, 459 U.S. at 471–72, 103 S.Ct. at 871–72. *See Sher v. Coughlin*, 739 F.2d at 81–82. The applicable New York State statutes and regulations place no limits on the discretion of state prison officials to assign inmates already in voluntary protective custody to the APPU. New York Correction Law § 137(1) (McKinney 1987) simply says that "[t]he commissioner shall establish program and classification procedures designed to assure the complete study of the background and condition of each inmate in

the care or custody of the department and the assignment of such inmate to a program that is most likely to be useful in assisting him to refrain from future violations of the law."[1] A regulation, N.Y.Admin.Code tit. 7, § 300.3(b)(1) (1983), provides that special housing units may be used for purposes of a "diagnostic and treatment center" and section 300.3(a) provides that "[a]ssignment of inmates to housing units within correctional facilities shall be made in accordance with criteria based upon the program of the inmate and the need for safety and security." Hall, already in voluntary protective custody, was under the regulations subject to "automatic admission" as an inmate "properly required to be confined in a special housing unit used as a ... 'diagnostic and treatment center,'" *id.* § 304.1(a)(1) (1986). There is no doubt that the Clinton APPU was a diagnostic and treatment center within the meaning of the regulations, *see* N.Y. Correction Law § 2(9); N.Y.Admin. Code tit. 7, § 100.15(c)(4) (1984). The APPU does not function as a protective custody unit as the district court thought. An inmate in protective custody is simply assigned to a safe cell for twenty-three hours a day, while the APPU accords him a multiplicity of rehabilitative programming, including academic and vocational training, counseling, and, not insignificantly, twelve hours a day outside his cell if he accepts the assigned program.

■ The first basis on which it can be argued that a liberty interest is implicated in Hall's transfer to the APPU is that somehow Hall was not "properly required to be confined" in the Unit. *See* N.Y.Admin.Code tit. 7, § 304.1(a). However, Hall was clearly a member of the "primary target population" for APPU, as an inmate who had demonstrated "an inability to function in [the] general [prison] population due to real or imagined fear of physical and/or verbal confrontation, harassment or pressures from other inmates...." The *APPU Assessment and Program Guidelines*[2] stated that some inmates could be identified for the program "because they are victimized or ... exhibit an extraordinary concern for their safety." Hall had marked himself out as a member of APPU's primary target population and as someone exhibiting an extraordinary concern for his safety, since he had been in voluntary protective custody for a period of over a year, almost from the beginning of his stay at Clinton. Hall's placement of himself in voluntary restrictive protective custody for over a year can be taken as identifying himself as an inmate of exactly the sort that APPU was designed to benefit.

■ The second possible basis for an argument that Hall was deprived of some liberty interest is that he was not given the battery of tests the district court considered necessary. The *Description of APPU Program* does indeed require that all participants undergo an extensive assessment and evaluation phase, including psychological and educational testing. This does not mean, however, that they were to undergo this assessment and evaluation before being assigned to the APPU, and we may presume that the program in which Hall refused to participate included this evaluation phase.

1. The statute also provides that

[s]uch procedures shall be incorporated into the rules and regulations of the department and shall require among other things: consideration of the physical, mental and emotional condition of the inmate; consideration of his educational and vocational needs; consideration of the danger he presents to the community or to other inmates; the recording of continuous case histories including notations as to apparent success or failure of treatment employed; and periodic review of case histories and treatment methods used.

2. The *Guidelines* and the *Description of APPU Program,* like the Policy Statement in *Pugliese v. Nelson,* 617 F.2d 916, 924 (2d Cir.1980), were simply internal prison documents which could not and did not endow inmates with any expectations of entitlement—at least inmates who were already in voluntary protective custody— and did not limit the discretion of the prison authorities. *Cf. Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981) (holding no entitlement created by pattern of behavior by Board of Pardons).

Nothing in the regulations states that an inmate already in voluntary protective custody is not "properly required to be confined in a ... 'diagnostic and treatment center,'" N.Y.Admin.Code tit. 7, § 304.-1(a)(1). Nor do the regulations specify that any procedures shall, will, or must be employed prior to transfer to the APPU, or that transfer to the APPU will not occur absent specified substantive predicates. Thus, under the teachings of *Hewitt* and *Sher*, the state scheme creates no liberty interest regarding a transfer from voluntary protective custody to the APPU. Hall was placed in limited privileges status only because he refused APPU programming. Procedures to transfer him out of the APPU began immediately after his refusal to participate and he was in fact transferred some twelve weeks later in accordance with the request he made on May 1. Any delay in transfer was attributable to the overcrowding of the Department of Correctional Services and consequent shortage of cells to which to transfer him; there had been, according to the former Supervisor of the APPU at Clinton, Charles Dufrain, a "cell crunch."

Nor does the choice of accepting the APPU program or going into limited privilege status implicate a liberty interest. The transfer of an inmate in voluntary protective custody to the APPU, as noted above, does not implicate a liberty interest, and neither does requiring such an inmate once in the APPU to choose between the program and limited privilege, for the same reasons. Hall's choice was between an APPU program and a limited privileges confinement that was scarcely different from the voluntary protective custody in which he had placed himself.

Finally, no liberty interest may be predicated upon the basis that the assignment to limited privileges was disciplinary rather than administrative. The confinement in this case, like the confinement in *Sher*, was administrative. *See Bolden v. Alston*, 810 F.2d 353, 357 n. 3 (2d Cir.1987) (disciplinary confinement is "imposed for the purpose of punishment after an adjudication of responsibility for some breach of prison regula-

tions"; other confinement is administrative); *see also Kelly v. Brewer*, 525 F.2d 394, 399 (8th Cir.1975) ("administrative segregation is not punitive and it looks to the present and the future rather than to the past").

That part of the district court's order that holds Hall was deprived of a liberty interest without due process and that strikes from his record entries of misconduct relating to incidents that occurred while Hall was confined in the APPU is reversed; that part of the order denying Hall money damages is affirmed.